UNITED STATES of America, Plaintiff,

v.

Lee SHUBERT, Jacob L. Shubert, Marcus Heiman, United Booking Office, Incorporated, Select Theatres Corporation, L. A. B. Amusement Corporation, Defendants.

Civ. A. No. 56–72.

United States District Court, S. D. New York.

June 11, 1980.

Gregory B. Hovendon, Bertha E. Hernandez, U. S. Dept. of Justice, Washington, D.C., for the United States.

Parker, Chapin, Flattau & Klimpl, New York City, for The Shubert Organization, Inc.; Alvin M. Stein, Barry J. Brett, Patricia L. Truscelli, New York City, of counsel.

LASKER, District Judge.

By consent decree of February 17, 1956 the defendants were enjoined "from acquiring a beneficial interest in any theatre, provided that . . .

(B) . . . defendants may acquire a beneficial interest in any theatre

(1) . . . upon an affirmative showing to this court that such acquisition will not unduly restrain competition . . ." (Consent Decree ¶ XXV)

Pursuant to those provisions the Shubert Organization, successor to the "Shubert defendants" as defined in Paragraph II(N) of the Consent Decree, moves for an order granting it permission to manage the National Theatre in Washington, D.C.[1] The application is granted.[2]

On April 2, 1980, at the request of the Antitrust Division of the Department of Justice, Shubert published a notice in *Variety* inviting public comment on Shubert's motion for permission to manage the National Theatre. In response to that notice the Antitrust Division received 34 communications, all but two of which were favorable to Shubert's application. Among them were two comments from the management of theatres in Washington that compete with the National Theatre, four from other competing theatre operators, and five from labor organizations, including Actors' Equity Association, all of which expressed the belief that the Shubert Organization is qualified to manage the National Theatre, and that allowing it to do so would further competition among Washington theatres.

---

1. Shubert seeks permission to manage the National Theatre in accordance with the terms of a Management Agreement dated January 29, 1980, which it entered into with the lessee of the theatre, the New National Theatre Corporation. Paragraph 2(A) of the agreement provides that it shall have a five year term.

2. According to the procedure adopted on the one prior occasion that Shubert sought permission to acquire a theatre, see *United States v. Shubert*, 305 F.Supp. 1288, 1289–90 (S.D.N.Y. 1969), the instant motion has been served on the Antitrust Division of the United States Department of Justice (which the court has held to be the only party with standing to be heard on such an application as this). The Nederlander Theatrical Corporation and Alvin Nederlander Associates, Inc. competitors of Shubert, sought leave to participate in these proceedings as *amicus curiae*. On March 20, 1980 representatives of Shubert, the Antitrust Division and Nederlander appeared before the court. While Nederlander's motion was denied, Nederlander was granted the right to present its views and any appropriate evidence.

Also at the March 20th conference, the court requested Shubert to submit a supplemental affidavit in support of its application for an order permitting it to commence booking attractions into the National Theatre immediately on an interim basis, pending a determination of this motion. Shubert's application for such an order was not opposed by the Antitrust Division, and on March 27th, after the requested supplemental affidavit was submitted and reviewed by the court, the court entered an order authorizing interim booking up to August 31, 1981.

Of the two adverse comments, the most forceful was that submitted by the Nederlander Theatrical Corporation and Alvin Nederlander Associates, Inc. ("Nederlander"), direct competitors of Shubert.

The Antitrust Division has submitted a memorandum to the court which reviews the arguments proferred in opposition to Shubert's motion.[3] It advises the court that in the view of the Department of Justice granting the application would foster rather than restrain competition, that if Shubert were to attempt to use the right to manage the National Theatre to gain a competitive advantage, the injunctive provisions of the consent decree would provide an adequate remedy, and that accordingly the Department does not oppose Shubert's application. By letter to the court dated June 5, 1980, the attorneys for Nederlander responded to the Antitrust Division's memorandum, and by letters dated June 5, 1980 and June 9, 1980, respectively, counsel for Shubert and the Antitrust Division replied.

Before disposing of the particular issues raised by the application and the objections to it, some general observations are in order. We believe that Nederlander mistakes the nature of this proceeding and the office of the court in the circumstances. This is not a plenary action in which the court sits as finder of fact *ab initio*, but an enforcement proceeding pursuant to a consent decree in which the court's function is limited to determining that the decree is observed. We conclude that Shubert has made the affirmative showing required by the decree, that permitting it to manage the National Theatre "will not unduly restrain competition."

Moreover, Nederlander's arguments have been met and defeated. In its memorandum in response to the notice in *Variety* and in its informal submissions to the court,

Nederlander argues that allowing Shubert to manage the National Theatre would restrain competition on a nation-wide basis, and that Shubert's past conduct "evidences a propensity" to violate the consent decree. The record demonstrates that the arguments are without merit.

Nederlander's principal contention is that allowing Shubert to control the National Theatre would permit it to gain dominance in the "try-out" circuit of Boston, Philadelphia and Washington. Nederlander claims that the relevant market by which the question of adverse effect on competition should be determined consists of these cities, where New York shows are previewed, and New York itself. The Department of Justice argues that the Washington metropolitan area is the relevant market. The record on this issue understandably does not include the wealth of data to be found in the proceedings of a plenary antitrust case. However, we are satisfied that whichever is the relevant market, Shubert has made the requisite showing, and we are reassured by the Department of Justice's conviction that Washington is the relevant market and that Shubert's entry into the picture in Washington will stimulate rather than lessen competition. Even assuming that Nederlander's characterization of the relevant market is correct, its own statistics show that if Shubert were allowed to manage the National Theatre its control of first class theatres in Boston, Philadelphia and Washington—which are the key "try-out" cities—and in New York, would be increased by only 2.2%. This increase has not been shown to have an anti-competitive effect, and it pales in the face of the evidence of pro-competitive effects in Washington which others, including the Antitrust Division, suggest would occur were Shubert's application granted.[4]

---

**3.** Nederlander's objections are reviewed in the text *infra*. The only other adverse comment was submitted on behalf of the Warner Theatre, which is located less than a block from the National. Prompted by its concern that if Shubert were to take over management of the National its own business would be adversely affected, the attorney for the Warner suggested

that the Antitrust Division conduct an investigation of the possible anticompetitive effects of such a take over. We are satisfied that the Division has conducted such an investigation which is adequate in the circumstances.

**4.** In 1969, Shubert sought and received permission under the consent decree to acquire a theatre in Los Angeles. See *United States v.*

Nederlander also argues that Shubert has not in the past complied with the consent decree and consequently is not entitled to the relief which it seeks here. Nederlander recites three incidents in which it contends Shubert violated the decree. Shubert, however, has in each instance rebutted the suggestion that its conduct was inconsistent with the decree.

First, Nederlander asserts that Shubert, "through the operation of the 'non-profit' Shubert Foundation, has apparently used the leverage of the capital it has available for investment in productions in order to gain attractions for Shubert theatres." [5] In support of this contention, Nederlander alleges that the Foundation has, through contributions to Joseph Papp's New York Shakespeare Festival, induced or coerced the Festival to move its commercially successful productions into Shubert theatres on Broadway. However, Shubert has established that its contributions to the Shakespeare Festival are unconditional, and that they represent less than one-half of 1% of the Festival's revenues, a level of contribution that cannot be said to provide significant "leverage." Moreover, many beneficiaries of Shubert Foundation grants have presented Broadway productions at non-Shubert theatres with no lessening of the Foundation's subsequent levels of contribution.

Second, Nederlander argues that Shubert has "taken over" Theatre Guild subscription lists in Chicago, Philadelphia and Boston, and "restricted access by subscribers in these cities to its theatres." [6] It appears, however, that the American Theatre Society, which provides subscription and promotional services under the aegis of the Theatre Guild, offered those services to Shubert, Nederlander and others. Shubert accepted the offer; Nederlander declined it. These services remain available to Nederlander and anyone else wishing to employ them. They have not been "taken over" by Shubert.

Third, Nederlander asserts that Shubert induced the producers of "Annie" to book it into a Shubert Theatre in Los Angeles on terms less favorable than those offered by an independent theatre. However, the record indicates that the creative artists involved in "Annie" chose the Shubert Theatre over the other after considering the relative merits of both proposals before them, concluding unanimously "that for the long term success of the show, both financially and aesthetically, the Shubert Theatre is their clear choice." [7] Nothing but Nederlander's unsupported statement suggests that Shubert played an untoward role in the episode. Nederlander, a co-producer of "Annie", was aware of how the choice between the two theatres was made and the reasons given for the choice, yet failed to put the whole story before the court. We can only assume that its objectivity was flawed by the fact that it is the operator of the independent theatre whose proposal was rejected.

In sum, Nederlander's claims that Shubert has shown a "propensity" to violate the consent decree and that allowing Shubert to manage the National Theatre would have an anti-competitive effect have been rebutted by Shubert, rejected by the Antitrust Division (the agency charged with protecting the public interest [8]) and are unsup-

*Shubert*, 305 F.Supp. 1288 (S.D.N.Y.1969). Since then, theatre in the Los Angeles area has apparently flourished, and several movie houses have been converted to legitimate theatres.

5. Memorandum of the Nederlander Theatrical Corporation at 20.

6. *Id.* at 22.

7. Exhibit W to the supplemental affidavit of Gerald Schoenfeld (letter of September 7, 1977 from Samuel C. Cohn, representing Mike Nichols, a co-producer of "Annie," to Roger L. Ste-

vens, Esq., of the John F. Kennedy Center for the Performing Arts).

8. Judge Kaufman noted in his opinion in this case dated March 24, 1960, in a statement quoted in the opinion of July 24, 1969, granting Shubert's prior application for permission to acquire a theatre in Los Angeles, 305 F.Supp. at 1292, that:

"The government is representing the public interest and it would be destructive of anti-trust enforcement to allow a third party who has private litigation pending against some of the

ported by the record. The Division has investigated Shubert's application, reviewed the comments submitted by the public and interested parties, and reported to the court its conclusion that granting Shubert's application would foster rather than restrain competition.

As we noted when we considered a prior application by Shubert to acquire a theatre, "Nederlander's estimate of the situation is based on hypothesized violations of the decree . . . . Any hypothesis, including that put forth by Nederlander, may be theoretically arguable in a case like this in which the parties and the court are called upon to forecast the competitive effect of the proposed acquisition." *United States v. Shubert*, 305 F.Supp. 1288, 1292 (S.D.N.Y. 1969). Again we conclude that the evidence adequately establishes that granting Shubert's application will not restrain competition. Moreover, the consent decree remains in effect. Should a valid claim be put before the court that the Shubert Organization is actually violating the decree as the result of its right to manage the National Theatre or for some other reason, the enforcement provision of the decree may be invoked and if the claim is justified will provide an adequate remedy to protect the public interest.

Shubert's motion for an order granting it permission to manage the National Theatre is granted.

---

parties to the consent decree to inject himself into this litigation. The government is in a better position to determine what serves the public interest best, the private litigant being apt to confuse the public interest with his private interest."